**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **BRIAN JONES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 13 C 3838** |
| | ) | |
| **RICK HARRINGTON, Warden,** | ) | |
| **Menard Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On November 6, 2000, after a bench trial, a Cook County Circuit Court judge convicted Brian Jones of the first-degree murder of Kenneth Dunne and the attempted first-degree murder of Lance Priest. The judge sentenced Jones to concurrent prison terms of forty-five years for the murder and twenty years for the attempted first-degree murder.

Jones has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He claims that there was insufficient evidence to support his conviction, that he received ineffective assistance of both trial and appellate counsel, and that his right to due process was denied. For the reasons discussed below, the Court denies Jones's petition.

### Background

**A.     Trial court proceedings**

The Court begins by describing the proceedings at Jones's trial in state court,

which commenced on August 1, 2000.

1.    **Prosecution's case**

a.    **Lance Priest**

The prosecution called Lance Priest, a member of the Gangster Disciples street gang, to testify.  Priest testified that on August 17, 1998, at approximately 1:45 a.m., he was standing in the parking lot of a liquor store with his cousin, Kenneth Dunne, who was not affiliated with a gang.  The area was brightly lit.  Priest testified that his friend Raleigh Pritchett drove up and began talking to them.

Jones, a member of the Blackstones gang and someone whom Priest had known for three or four years, then walked up to Priest, Dunne, and Pritchett.  Jones was wearing a blue and white checkered shirt and blue jeans.  According to Priest, Jones said, "What's up folks?," lifted his shirt, and reached into his waistband.  At that point, Priest began running away and heard twelve to fourteen gun shots shortly thereafter.  Priest testified that he looked back and saw Jones shooting at Dunne and at Priest himself.

Priest ran to a parking lot across the street from the liquor store and then ran back to Dunne.  Upon seeing a red car driven by someone who looked like the shooter, Priest left Dunne's side once again.  When he returned, Priest found police officers at the scene and saw that Dunne had died.  Priest testified that he identified himself as Dunne's cousin and informed the police that "Bird" was the shooter.  Officers then placed Priest in a police car and brought him a picture of Jones.  Priest identified Jones as the shooter.

Next, the same red car from which Priest had fled pulled up five or six feet away

from the police car in which Priest was sitting.  Priest testified that he saw that the driver was Jones and told the police that the driver was the shooter.  The police then ran after the car but could not catch up.  Later, police officers took Priest to a particular address, where they brought Jones out and asked Priest if he could identify him.  Priest stated that Jones was "Bird."

On cross-examination, Jones's trial counsel elicited from Priest that he had seen Jones wearing a blue and white checkered shirt before, that Dunne did not belong to the Gangster Disciples, that the Blackstones and Gangster Disciples fought with each another, and that the shooting had transpired very quickly.  Jones's counsel further demonstrated that Priest had to have been standing about seventy-five feet away from the shooter when he saw him.

### b.    Raleigh Pritchett

The prosecution also called Pritchett as a witness.  Pritchett testified that on August 17, 1998, at approximately 1:50 a.m., he was parked in the parking lot of a liquor store, which was located in a brightly-lit area.  Pritchett said he was talking to Priest and Dunne when a man walked up to them, said, "What's up, folks?," reached into his pants, pulled out a black gun, and shot at Dunne and Priest.  Pritchett testified that the shooter was wearing a blue and white checkered shirt and blue jeans.  Pritchett testified that he drove off, circled the block, and found several police officers present when he returned to the scene of the crime.

Under cross-examination, Pritchett stated that he was unable to identify the shooter even though he said he had seen him for about two minutes.

### c.  Police officers

The prosecution also called as witnesses several of the police officers involved in the investigation of the murder.  Sergeant Anita Medina testified that on August 17, 1998, at approximately 4 or 4:30 a.m., she was on patrol.  She and her partner went to a specific address to apprehend Jones.  When they reached the address, Medina saw Jones in custody at the back of the apartment building at that address.  Medina testified that Jones was wearing jeans but no shirt.  The police recovered a blue and white checkered shirt from the same apartment building.  On cross-examination, Medina stated that she did not remember exactly where the police had found the blue and white checkered shirt, though she did recall that it was not hidden.

The prosecution also called Officer Dan Ordanas to testify.  Ordanas stated that on August 17, 2008, at approximately 1:49 a.m., he responded to the call regarding Dunne's murder, which he said appeared to have occurred in a well-lit area.  Ordanas obtained photographs of a man known as "Bird" and gave two of these photographs to detectives at the scene of the crime.

Ordanas testified that while he was at the scene, a red car pulled up fifteen to twenty feet away from him, with nothing obstructing his view of the car.  After some people stated that the offender was in the car, Ordanas started to chase the car on foot.  Ordanas and other officers were unable to apprehend the driver or stop the car.

Officer Richard Maxwell, who also responded to the call for Dunne's murder that night around 1:49 a.m., also testified for the prosecution.  He stated that the red car pulled up about twenty feet away from him, which led to a commotion involving people yelling, "That's Bird."  Maxwell said he walked to the vehicle and ordered the driver to

park and exit the vehicle. The driver instead put the car in reverse and began backing away. Maxwell then ran toward the vehicle and radioed for help.

Maxwell testified that he was able to track down the car and that this led him to Lasandra Mathies's address. Mathies came downstairs, where she and Maxwell spoke briefly. Maxwell testified that he had a strong feeling that Jones was inside Mathies's apartment building. Maxwell called for back-up and knocked on one of the front doors of Mathies's building. At this point, Jones came running out of one of the building's back doors, where a number of officers, including Maxwell, arrested him. Maxwell asked Jones his name, and Jones answered. Maxwell remembered that Jones was bare-chested when he was arrested. On cross-examination, Maxwell testified that the driver of the red car was wearing a light blue shirt that could have been blue and white checkered.

### d. Sharee Jackson

Finally, the prosecution called Sharee Jackson as a witness. Jackson testified that she went to Mathies's home around 8 p.m., where she found Mathies, her children, and her niece. Jackson stated that Jones and his friends, Byron Manson and Quasi Lester joined them at some point. She testified that Jones was wearing a blue and white checkered shirt and that she saw a black gun on his side in his pants. Jackson said that Jones left Mathies's home with Manson around 1 a.m. and acted frustrated and nervous when he returned.

On cross-examination, one of Jackson's attorneys asked whether she had spoken to him by phone before. After Jackson replied that she had, the attorney asked if she had told him during this phone conversation that Jones possessed a gun and

stated that he had shot someone on the night of the murder.  It is apparent from the context that the attorney's contention was that Jackson had not said this during the phone interview.  After Jackson replied that she *had* told the attorney this, the attorney continued to question her about the conversation, and the prosecution interjected with the argument that the attorney was making himself a witness.  The trial judge stated that the attorney could continue his line of questioning but would have to withdraw if he wanted to prove up the impeachment.  After the conclusion of Jackson's testimony, the other attorney representing Jones said he had discussed the matter with the first attorney and with Jones and that they did not intend to call the first attorney to prove up the impeachment.  The trial judge made clear that this meant that the impeachment would remain unperfected and that the judge would be unable to consider it.

During cross-examination, Jackson also admitted to not saying anything about Jones having gun until she was taken to the police station, but she said that the police did not suggest to her what she should say happened on the night of Dunne's murder.  Jackson did not recall telling officers, however, that Jones had a blue steel gun as opposed to a black gun.

 Jackson further testified that Jones likely left Mathies's home after midnight, was gone for an hour, and returned with Manson.  Jackson said that she did not see the gun again when he returned.  Jackson added that Jones then left Mathies's home a second time and returned at about 1 or 2 a.m.

**2.     Defense case**

**a.     Brian Jones**

Jones testified in his own defense.  He stated that, at the time of Dunne's murder,

he had owned a blue and white checkered shirt for three to four months, wore the shirt frequently (about twice a week), and saw Priest about four or five times a week.  Jones stated that Priest had seen him wearing the shirt.  Jones added that several people in his neighborhood were wearing the same type of shirt around the time that Dunne was murdered.

Jones testified that in August 1998, he was dating Mathies.  On August 17 of that year, he was at Mathies's home with her children and niece, as well as Jackson, Manson, and Lester.  Jones stated that he did not have a gun that evening.

Jones said he left Mathies's home with Mathies around 12:45 or 1 a.m. to go to a liquor store and then again at 3 or 3:30 a.m. with Manson to get cigarettes.  On the way to pick up cigarettes, Jones and Manson noticed four or five police cars in a particular area.  They stopped in that area on their way back to Mathies's home.  Jones saw about twenty members of the Gangster Disciples and heard a few of them say, "There go Bird right there."  Jones confirmed that "Bird" is his nickname.  Jones testified that he and Mathies backed away from the police car because Jones had marijuana on him and Manson had cocaine.

After they returned to Mathies's home, Jones said, he saw Mathies talking to the police outside of her apartment building.  Jones testified that he went to the back of Mathies's apartment building to hide his marijuana, putting it on one of the window sills. Jones was then arrested and gave the arresting officers his name.  He said that he answered the officers' questions truthfully and agreed to undergo a gunshot residue (GSR) test.

On cross-examination, Jones testified that he had kept his shirt off when he was

inside Mathies's home because it lacked air conditioning. Jones stated also that Lester and Manson were friends of his.

### b. Lasandra Mathies

Jones's trial counsel also called Mathies to testify. Mathies confirmed that she was dating Jones as of the date of the shooting. Mathies testified that she, her children, her niece, and Jackson were all at Mathies's home on August 16, 1998, when Jones, Manson, and Lester came over around 10 or 11 p.m. Mathies stated that her apartment was warm due to a lack of air conditioning. She said that she never saw or felt a gun on Jones. She also testified that Jones never washed his hands in her presence, though he did use the washroom while at her home.

Mathies testified that she and Jones left her home around 12 or 1 a.m. for a nearby liquor store and that after they returned to her home, they heard gunshots while sitting together. She stated that Jones did not leave her sight until 3 a.m., when he went out to buy cigarettes with Manson.

Mathies acknowledged testifying before a grand jury on August 27, 1998 that she dropped Jones off somewhere after buying beer and heard the gunshots while by herself. Mathies stated that her testimony before the grand jury was untrue and that it stemmed from pressure from the prosecutor to change her story. Mathies stated that she never told the prosecutor that Jones left her side, but she conceded that she did not correct his statement to that effect.

On cross-examination, Mathies testified that Jones remains a friend and that she does not want to see him go to jail.

### c. Defense firearms expert

Jones's trial counsel called Robert Berk, an expert in trace evidence analysis, to testify. Berk testified that the results of the GSR testing on Jones's hands were inconclusive, meaning that Jones had on his hands elevated levels of two of the three substances associated with gunshots, but not the third, and that all three must be present for a positive result. Berks also opined that based on the levels of the two substances on Jones's hands at the time of testing, he had not washed his hands recently. Berk testified that a positive GSR test result would be likely if a person who fired twelve to fourteen shots from a handgun was tested as near in time to the shooting as Jones was.

On cross-examination, Berk stated that gunshot residue can be transferred from one's hands to one's clothes through even normal activity.

### 3. The judge's finding

The trial judge found Jones guilty of first-degree murder and attempted first-degree murder based on Priest's identification of Jones as the shooter, Pritchett's corroboration of Priest's identification, and Jackson's testimony regarding Jones's possession of a gun and his comings and goings on the night of the murder. The judge sentenced Jones to forty-five years for the first conviction and twenty years for the second, with Jones to serve the terms concurrently.

### B. Jones's post-trial motion

After the state trial judge convicted him, Jones filed a post-trial motion in which he argued that the prosecution had failed to prove his guilt beyond a reasonable doubt. Jones argued, among other things, that Priest, the only witness to identify Jones as the

shooter, saw him only for a matter of seconds, from nearly seventy-five feet away, and based his identification on a shirt that Jones was wearing at the time. At the hearing on the motion, Jones's lawyer argued that "the Court's finding was against the weight of the evidence for the simple reason that the evidence against Mr. Jones consisted of a split-second, single-finger I.D. at night of an individual who had no motive to hurt Mr. Dunne . . . ." Resp.'s Ex. C at 235.

The prosecution countered that Priest had seen Jones's face and had known Jones for four years. It also argued that Jackson, who testified that she had seen Jones with a gun and that he was nervous and flustered when he returned to Mathies's home, had "burie[d] Brian Jones." *Id.* at 247. The prosecution also highlighted Pritchett's corroborative testimony. *Id.* at 248.

The trial court denied Jones's motion, stating that Priest lacked a motive to falsely identify Jones as the shooter, knew Jones from before the shooting, and made the identification in a well-lit area. *Id.* at 251. The judge also credited Jackson's testimony that Jones was carrying a gun before he went out and Pritchett's statement that the shooter was wearing a blue and white checkered shirt. *Id.* at 253.

Jones appealed his conviction, arguing that there was insufficient evidence to support it. The state appellate court affirmed Jones's conviction on August 6, 2002. *People v. Jones*, No. 1-01-947, slip op. (Ill. App. Aug. 6, 2002). The court concluded that the evidence supported Jones's conviction. It relied specifically on Priest's identification of Jones as the shooter and Pritchett's description of the offender's clothing, which corroborated Priest's testimony. The court also cited Jackson's testimony that she saw Jones leave Mathies's home with a gun and return without it and

that he appeared nervous and flustered upon his return.

Jones then filed a petition for leave to appeal, which the Illinois Supreme Court denied on December 5, 2002. *People v. Jones*, 202 Ill. 2d 637, 787 N.E.2d 163 (2002).

## C.    Jones's post-conviction petition

On June 5, 2003, Jones, represented by new counsel, filed a post-conviction petition. On August 19, 2009, he filed a supplemental petition in which he raised the following claims: 1) ineffective assistance of trial counsel for: a) failing to request GSR testing of Jones's shirt, b) failing to impeach Priest with evidence that Dunne belonged to a gang, c) failing to present the testimony of certain witnesses in support of an alibi defense, and d) failing to impeach the testimony of Jackson; 2) ineffective assistance of appellate counsel for not arguing ineffective assistance of trial counsel; and 3) prosecutorial misconduct in pressuring Priest to withdraw his recantation of his identification of Jones as the shooter.

The prosecution filed a motion to dismiss the petition, which the trial court granted on July 21, 2010. Jones appealed the dismissal, and the Illinois Appellate Court affirmed on May 4, 2012. *People v. Jones*, 2012 IL App (1st) 102516-U. The Illinois Supreme Court denied Jones's petition for leave to appeal on September 26, 2012. *People v. Jones*, 979 N.E.2d 883 (Ill. 2012).

## D.    Jones's habeas corpus petition

On May 23, 2013, Jones filed the present habeas corpus petition. He makes three claims: 1) there was insufficient evidence to convict him of either first-degree murder or attempted first-degree murder; 2) trial and appellate counsel rendered ineffective assistance in failing to request GSR testing of Jones's shirt, failing to

impeach Priest's testimony regarding Dunne's gang affiliation, neglecting to interview and call Manson and Lester as alibi witnesses and present an adequate alibi defense, and failing to impeach Jackson' testimony; and 3) Jones's right to due process was denied when he was unable to present evidence of Priest's recantation. *See* Pet. at 5.

### Discussion

A petitioner is entitled to a writ of habeas corpus if he or she was convicted in violation of the Constitution or federal law. 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if the state court's decision was: 1) "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 2) . . . 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court." *Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013) (quoting 28 U.S.C. § 2254(a), (d)(1)–(2)). In making these determinations, "[t]he state court's factual findings are presumed correct, and rebutting them requires clear and convincing evidence." *Id.* at 703.

A federal court reviews the "final reasoned opinion by the state courts. . . ." *Id.* In order for the state court's decision to be contrary to clearly established federal law, "it must either apply a rule that contradicts the governing law set forth in a Supreme Court case or come to a different outcome than the Supreme Court has reached on materially indistinguishable facts." *Hanson v. Beth*, 738 F.3d 158, 162 (7th Cir. 2013). In order for a state court decision to involve an unreasonable application of clearly established federal law, "the state court must apply the Supreme Court's precedents to the facts 'in an objectively unreasonable manner.'" *Id.*

**A.     Sufficiency of the evidence**

Jones argues that the evidence offered at trial was insufficient to support his convictions and that the state appellate court unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, review of a conviction for claimed insufficiency of the evidence

> does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318-19 (internal quotation marks and citations omitted). In addition to the deference given on appeal to the trier of fact's determination of guilt, a federal court considering a habeas corpus petition must accord deference to a state court's decision on the sufficiency of the evidence, upholding that decision unless it was "objectively unreasonable." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).

The state appellate court set forth the proper standard for reviewing Jones's claim of insufficiency of the evidence. The court then cited *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989), for the proposition that "the positive credible identification of a defendant by a single witness who had adequate opportunity to view him is sufficient to sustain his conviction." Pet'r's Ex. A at 9. The court cited several factors used to determine whether a given witness's identification is reliable: 1) whether the witness had an adequate opportunity to view the offender at the time of the crime, 2) the witness's degree of attention, 3) the accuracy of the witness's earlier description, 4) the level of certainty that the witness when he confronted the offender, and 5) the amount of time that elapsed between the crime and confrontation. *Id.* The court further

stated that the witness's credibility is enhanced when he testifies that he knew the defendant before the crime. *Id.* at 9-10.

The state court found that Priest's identification of Jones as the shooter was credible based on consideration of these factors. The court said that Priest had an adequate opportunity to view the offender, indeed his "whole body," because the area where the shooting occurred was "well lighted" and "there was nothing obstructing Priest's view." *Id.* at 10. The court stated that "Priest's attention was naturally drawn to defendant when defendant approached and said, 'What's up folks.'" *Id.* The court further noted that "Priest immediately and unequivocally identified defendant" and that he did so "within minutes of the shooting." *Id.* Finally, the court took into account the fact that Priest had known Jones for several years before the crime occurred. *Id.* The court concluded that a rational trier of fact could find Priest's identification sufficient by itself to sustain Jones's convictions.

The appellate court also found that the testimony of Pritchett and Jackson, both of whom had testified under subpoena, corroborated Jones's identification. As recounted earlier, Jackson reported seeing Jones leave Mathies's home with a gun and return without it, nervous and flustered. The court stated that "[a]ny discrepancies in [Jackson's] testimony were properly resolved by the trial court, which was free to accept as much or as little of her testimony as it pleased." *Id.* at 11. The court observed further that Pritchett's description of the shooter's clothing matched the description given by Priest. *Id.*

This Court cannot say that the state appellate court's decision amounted to an unreasonable application of the standard in *Jackson*. Under that standard, the

appellate court was required to, and did, view the evidence in the light most favorable to the prosecution. Considered in that light, neither Jones's identification, nor Priest's and Jackson's testimony, was inherently incredible. The Seventh Circuit has said that it is "black letter law that testimony of a single eyewitness suffices for a conviction even if 20 bishops testify that the eyewitness is a liar." *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009). The appellate court did not unreasonably apply *Jackson* in holding that a rational trier of fact could have found beyond a reasonable doubt that Jones committed first-degree murder and attempted first-degree murder.

**B.     Ineffective assistance of trial counsel**

Jones contends that his trial counsel rendered ineffective assistance in not: 1) requesting testing of his shirt for GSR, 2) impeaching Priest's testimony regarding Dunne's gang affiliation, 3) interviewing and calling Manson and Lester as alibi witnesses, and 4) perfecting the impeachment of Jackson. Jones also asserts that his trial counsel's cumulative errors amounted to ineffective assistance.

Because the state appellate court considered Jones's ineffective assistance claims on their merits, this Court does not determine in the first instance whether trial counsel's action or inaction constituted ineffective assistance. Rather, the Court assesses whether the state appellate court's determination of this issue was contrary to or involved an unreasonable application of, federal law. Under *Strickland v. Washington*, 466 U.S. 668 (1984), to prevail on an ineffective assistance of counsel claim, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *Id.* at 687-88.

"In any case presenting an ineffectiveness claim, the performance inquiry must

be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. The *Strickland* Court established "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (internal quotations omitted). But counsel must undertake reasonable investigation or make a reasonable decision not to investigate the particular matter in question. *Id.* at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

As for whether counsel's action or inaction prejudiced the petitioner, *Strickland* requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If a defendant makes an insufficient showing on either one of the components of the two-part *Strickland* test, the reviewing court need not consider the remaining component. *Id.* at 697; *see also Pearson v. Callahan*, 555 U.S. 223, 241 (2009). With the standard in mind, the Court turns to the state appellate court's treatment of Jones's ineffective assistance claims.

### 1. Failure to test Jones's shirt for GSR

As described earlier, the police asked Jones to undergo GSR testing of his hands, and he agreed. Berk, the expert retained by Jones's defense counsel, testified at trial that the results were inconclusive, meaning that they could not be associated with gunshot residue. On cross-examination, the prosecution asked Berk what would happen if a person who had shot a gun kept taking his shirt off and putting it back on

over a period of time.  Berk answered that gunshot residue can be transferred from one's hands to one's clothes through even normal hand activity.  During closing arguments, the prosecution suggested that the reason the test results were inconclusive was that Jones had rubbed off much of the residue on his shirt in taking it off and putting it back on throughout the night.

It is undisputed that Jones's trial counsel could have, but did not request testing of Jones's shirt.  Jones argues that this constituted ineffective assistance of counsel.

In affirming the state trial court's order dismissing Jones's post-conviction petition, the state appellate court correctly set forth the *Strickland* standard.  The court then concluded that "[t]rial counsel made a sound tactical decision to forgo GSR testing for defendant's shirt" because "testing the shirt for GSR could have proven detrimental to defendant's case, with little, if any, potential for improving it."  Pet'r's Ex. B at 18. Specifically, a positive test result would have implicated Jones, whereas, given the inconclusive test of Jones's hands, the fact that no one had tested the shirt allowed defense counsel to argue that the prosecution, which had the burden of proof, had failed to establish a forensic link between Jones and the crime.  *Id.*

The Court concludes that the state appellate court reasonably applied *Strickland* to the claim regarding defense counsel's failure to seek GSR testing of Jones's shirt. The court noted that counsel already had at his disposal an inconclusive and arguably exculpatory GSR test—which was a good thing for Jones—and that he could not know in advance what testing the shirt would show.  Though reasonable minds might differ on this point, the state court's conclusion that the decision not to do testing on Jones's shirt constituted "sound trial strategy" was not unreasonable.  *Id.* at 689.  Given this

determination, the state appellate court was not required to address the issue of prejudice.

### 2. Failure to impeach Priest regarding Dunne's gang affiliation

Priest testified at Jones's trial that Dunne did not belong to a gang.  But on the night of the murder, Priest told police that Dunne was a fellow member of the Gangster Disciples.  Jones contends that his trial counsel rendered ineffective assistance in failing to impeach Priest on this particular point.

The state appellate court began its discussion of this issue by citing *People v. Pecoraro*, 175 Ill. 2d 294, 326, 677 N.E.2d 875, 891 (1997), for the proposition that a decision not to impeach a witness is "a matter of trial strategy which will not support a claim of ineffective assistance of counsel."  The court stated that a "[d]efendant must show that counsel's approach to cross-examination was objectively unreasonable," thereby correctly invoking the *Strickland* standard.  Pet'r's Ex. B at 19.  The court concluded that Jones's trial counsel faced a choice between impeaching Priest on a relatively minor point and thereby perhaps lending credence to the prosecution's theory that Jones committed the crimes of which he was convicted due to gang rivalry, or foregoing impeachment on this point.  *Id.*  The court also noted that "defense counsel extensively cross-examined, and impeached, Priest on many other issues," leaving the value of the impeachment that Jones's claim concerns "likely minimal."  *Id.*  Under the circumstances, the court concluded, trial counsel's strategy was "certainly reasonable."  *Id.*

The Court concludes that the state appellate court did not unreasonably apply *Strickland* to counsel's allegedly deficient failure to impeach Priest.  Given the

circumstances of Jones's case, including the weight that a potential motive would have added to the prosecution's case against him, the state appellate court was justified in holding that foregoing impeachment Priest on this point constituted reasonable trial strategy (as opposed to a flawed tactic or oversight).  The fact that Jones's trial counsel impeached Priest on other grounds only bolsters this conclusion.

### 3.     Failure to interview or call Manson and Lester; failure to present an adequate alibi defense

Jones testified at trial that Manson and Lester were friends of his and that he left Mathies's home with Manson after 3 a.m. to pick up cigarettes.  Jackson testified, in contrast, that Jones left Mathies's home with Manson for about an hour between approximately midnight and 1 a.m.

Jones's trial counsel did not interview Manson or Lester in the course of their investigation and did not call either of the two as alibi witnesses at Jones's trial.  Both Manson and Lester submitted affidavits in connection with Jones's post-conviction petition in which they stated that they were prepared and available to corroborate Jones's testimony at trial.  Jones also submitted an affidavit from his mother, who stated that  she had repeatedly asked Jones's trial counsel to interview and call these witnesses to testify.  Jones asserts that counsel's failure to do so constituted ineffective assistance of counsel.

Applying *Strickland*, the state appellate court cited *People v. Richardson*, 189 Ill. 2d 401, 414, 727 N.E.2d 362, 370 (2000), for the proposition that decisions by counsel whether to present particular witnesses are ordinarily strategic choices that do not support viable ineffective assistance claims.  At the same time, the court acknowledged that an attorney's failure to investigate with regard to a particular witness or evidence

can constitute ineffective assistance, depending on the value of the witness or evidence. Pet'r's Ex. B at 13.

The appellate court observed that Manson and Lester had given statements to the police, which were produced to defense counsel prior to trial, in which they were reported as having stated that Jones had left Mathies's home around 1:30 a.m. and returned around 2:30 a.m. This would not have supported an alibi defense; indeed, it was contrary to a claim by Jones that he could not have been at the crime scene when the shootings took place around 1:45 a.m. The state court further observed that the prosecution subpoenaed Manson and Lester to appear at trial in support of its case against Jones. Though the two ultimately did not appear pursuant to subpoena, the fact that the prosecution had subpoenaed them tended to support the notion that they were expected to support the prosecution's case, not undercut it.

The state appellate court concluded that given these factors, the decision of Jones's trial counsel not to interview and then call Manson and Lester as alibi witnesses did not constitute ineffective assistance, because it amounted to an objectively reasonable strategic decision. Pet'r's Ex. B at 15. The court stated that "[a]lthough interviewing Manson and Lester would have given defense counsel a better view of the *substance* of the testimony they would give at trial, their prior statements gave defense counsel a clear view of the *value* of Manson's and Lester's testimony." *Id.* at 16. The state appellate court reasoned that "[t]he best case scenario for defense counsel would have been for Manson and Lester to testify in support of defendant's alibi defense, only then to be severely impeached based on their multiple prior inconsistent statements and their relationship with defendant." *Id.*

The state appellate court did not unreasonably apply *Strickland* to Jones's claim regarding Manson and Lester.  In referencing the inculpatory statements by these witnesses that the police had memorialized, the state appellate court did what *Strickland* requires—it took into account the circumstances at the time and sought to avoid judging counsel's actions via hindsight.  *See Strickland*, 466 U.S. at 680.  It is conceivable that counsel, had they interviewed Manson and Lester prior to trial, would have found that their actual testimony would have supported an alibi defense.  But even if so, presenting them as alibi witnesses would have exposed them to severe impeachment based on their memorialized prior inconsistent statements to the police.  The ultimate result could have been more damaging to the defense than not presenting these witnesses at all.

Jones also asserts with regard to the alibi issue that trial counsel did not adequately consult with him regarding the theory of defense to be presented at trial and that counsel were ineffective because they did not disclose the alibi defense until after the trial had already begun, contrary to discovery rules requiring advance disclosure of such defenses.   On these points, the state appellate court concluded that "[o]ther than the fact that the defense was unsuccessful, defendant presents no evidence to demonstrate prejudice."  Pet'r's Ex. B at 17.  The court noted, in particular, that there was nothing in the record to suggest that the trial court sanctioned Jones or his counsel for disclosing the alibi defense after the trial had already begun or precluded him from presenting alibi evidence.  *Id.*

Given Jones's failure to offer any evidence of prejudice, the Court concludes that the state appellate court applied the prejudice element of the *Strickland* test reasonably on these points.  Jones simply did not show that absent these particular failings on the

part of counsel, there was a reasonable probability that the outcome of the trial would have been different.

### 4.     Failure to perfect impeachment of Jackson

At trial, one of Jones's attorneys tried to impeach the testimony of Sharee Jackson based on a statement she purportedly had made to that same attorney, who evidently had no other witness to the statement.  Jones maintains that in this statement, Jackson recanted her statement that Jones was carrying a gun and said that he had killed someone.  The prosecution objected to the attorney's line of questioning on the ground that he was making himself a witness.  In response, the state trial court said, in essence, that the attorney had to decide whether he intended to prove up the impeachment, which would have required him to withdraw because he would be a witness.  After a break, Jones's other attorney reported to the trial judge that he had conferred with the first attorney and Jones and that the first attorney would not be testifying on Jones's behalf.  The trial judge said that as a result, the impeachment could not be perfected, thus precluding the court from considering Jackson's purported prior statement or finding an inconsistency.  Jones contends that counsel's conduct amounted to ineffective assistance.

The state appellate court began by reiterating the proposition that a decision not to impeach a particular witness is typically a strategic choice that does not give rise to a viable ineffective assistance claim.  Pet'r's' Ex. B at 7.  The court stated that "[d]efense counsel's cross-examination did not consist of the single unperfected impeachment . . .; the record reveals that defense counsel extensively cross-examined Jackson on many issues, including her prior statements regarding defendant's statement and defendant's

22

possession of a gun." *Id.* at 10. The court noted, for example, that Jones's trial counsel called a detective to testify that Jackson, contrary to her trial testimony, had not reported Jones stating, "I shot him, moe." The court further noted that Jones's counsel established that Jackson did not tell the police that Jones had a gun until later, when officers questioned her at the police station. The court also observed that Jones's counsel questioned Jackson about the possibility that the police may have suggested to her in the first instance that Jones had a gun on the night of the shooting.

The state appellate court concluded that Jones failed to satisfy the first part of the *Strickland* test. It stated: "At worst, with the benefit of hindsight, we could classify counsel's decision not to perfect the impeachment regarding Jackson's statements to him as a mistake in trial strategy or an error in judgment." *Id.* at 11. The court concluded that this did not render the actions of Jones's trial counsel "constitutionally defective." *Id.*

This Court is inclined to find unreasonable the state court's determination on the first part of the *Strickland* analysis, that is, the question of whether trial counsel's conduct fell below an objective standard of reasonableness. Any reasonably competent lawyer would have anticipated an objection to the lawyer's attempt to impeach a witness on a prior inconsistent statement heard only by the lawyer. Competent lawyers in this situation ensure that when interviewing witnesses they have a "prover" present, namely someone who can testify about the witness's inconsistent statements if that ultimately is required. This is done by reasonably competent lawyers in order to avoid the exact situation that Jones's counsel faced when Jackson denied making the earlier statement. Because counsel had interviewed Jackson by himself, when she gave inconsistent

testimony at trial, he was stuck between a rock and a hard place, a predictable and easily avoidable state of affairs.

Given the circumstances, it is difficult to say, as the appellate court did, that counsel's actions amounted to a mere "mistake in trial strategy or an error in judgment." *Id.* Given his failure to take the reasonable and appropriate steps when conducting the interview of Jackson, counsel was not in a position to make a judgment call or strategic decision at that point.[1] For these reasons, it would be more accurate to characterize counsel's actions as a *failure* of judgment and an *absence* of strategy.

This, however, does not warrant overturning the state appellate court's rejection of Jones's ineffective assistance claim relating to the impeachment of Jackson. After making its ruling on the reasonableness of trial counsel's conduct, the court went on to determine that Jones had failed to show the requisite prejudice, that is, "that the result of the proceedings would have been different" but for counsel's conduct. *Id.* at 12. In this regard, the court noted first that defense counsel had effectively impeached Jackson on other points. *Id.* The court also found that Jones had "overstated the importance of Jackson's testimony in light of all the evidence presented at trial." *Id.* Specifically, the court rejected Jones's contention that Jackson was the only witness who had connected Jones to a firearm, noting Priest's testimony that Jones pulled a gun out of his waistband and Pritchett's description of the shooter and his behavior on the night of the crime. The court also noted that there was other considerable evidence of Jones's guilt, including Priest's identification of Jones as returning to and then fleeing

---

[1] Even then, it does not appear that there would have been a downside in counsel withdrawing to prove up the impeachment, because there were two lawyers representing Jones, and the other one could have taken over. The disruptive influence this might have had on a jury did not exist, because this was a bench trial.

from the crime scene; the identification of Jones by police officers as the same man whom Priest had described as speeding away; and the facts that Jones was bare-chested when the police apprehended him and that officers found a blue and white-checkered shirt at Mathies's apartment consistent with the one the shooter was described as having worn. *Id.* at 12-13.

The appellate court's analysis of the prejudice issue was reasonable. Though Jackson certainly contributed to the prosecution's case—otherwise the prosecution would not have called her to testify—the state court reasonably concluded that her contribution was not as significant as Jones contends. And her testimony was impeached by defense counsel in other ways. Thus it was reasonable to find, as the appellate court did, that Jones had failed to show a reasonable probability that the outcome of the trial would have differed had this particular aspect of the impeachment of Jackson been perfected. *See Malone v. Walls*, 538 F.3d 744, 751 (7th Cir. 2008) ("although this additional testimony would have affected the weight accorded the [witness's] testimony . . . the effect of the alleged deficiencies was not so significant as to cast doubt on the outcome of the trial.").

### 5. Trial counsel's cumulative errors

Jones also contends that the cumulative effect of his trial counsel's errors prejudiced his defense. The only argument he Jones offers in support of this claim is the bare-bones comment that "[b]ecause the evidence was not overwhelming, it is more likely that the errors of counsel had a greater impact on the trier of fact than a stronger prosecution case." Pet. at 55.

The state appellate court did not address this issue. The Court rejects Jones's

claim. The Court has concluded that the state appellate court reasonably rejected most of Jones's ineffective assistance claims on the ground that Jones had failed to show professionally unreasonable conduct. Thus those actions by counsel cannot contribute to a "cumulative prejudice" analysis. The two remaining points were insignificant enough that aggregating the prejudice arguably caused does not enable Jones to clear the hurdle established by *Strickland.*

## C.     Ineffective assistance of appellate counsel

Jones also argues that his appellate counsel should have raised on direct appeal his trial counsel's ineffective assistance in not requesting GSR testing of Jones's shirt, presenting an alibi defense after Jones's trial had already started, and not perfecting Jackson's impeachment. Pet. at 55.

The state appellate court agreed with the state trial court's judgment that because Jones did not make a substantial showing that trial counsel was ineffective, he did not make a substantial showing that appellate counsel was ineffective. This Court has ruled that the state court reasonably rejected Jones's claim of ineffective assistance of trial counsel. It follows that the state appellate court's treatment of his claim of ineffective assistance of appellate counsel was likewise reasonable.

## D.     Due process

After the trial, Priest recanted his identification of Jones as the shooter in an affidavit filed in support of Jones's post-conviction petition for relief. *See* Pet'r's Ex. C. In the affidavit, Priest stated that on the morning of the crime, the police told him that they had caught the man who had killed Dunne. The police then led Priest to an area where they asked him to view a man wearing a blue and white checkered shirt and

questioned whether he was the same man who had killed Dunne.  Priest stated in his affidavit that he could not see the man's face because the lights of the police car were too bright but that he identified the man as the shooter because the police said they had other evidence implicating the man.  Jones acknowledges that Priest has since repudiated this recantation.

Jones presented Priest's recantation with his post-conviction petition.  The state trial court, however, did not hold an evidentiary hearing on the petition, and the appellate court affirmed that determination on appeal.  Jones argues that the absence of an evidentiary hearing violated his due process rights.  As Jones puts it in his reply brief, his argument is "rooted in principles of due process related to the failure of the state courts to afford him an opportunity to present evidence that, if believed, would give him a reasonable likelihood of acquittal."  Reply at 12.

Respondent interprets this as a claim about presentation of false evidence at trial and argues that it is deficient because there is no evidence that the prosecution was aware that it was presenting false testimony.  *See* Resp. at 21-22.  Jones, however, expressly disavows making such a claim.  *See* Reply at 12.  Rather, his claim is that he should have been given an evidentiary hearing regarding Priest's recantation and that the state courts' failure to give him one violated due process.  *See* Pet. at 56-57.  It is not clear that Jones argued the point this way before the state appellate court, but assuming he did, the state courts' failure to grant an evidentiary hearing on the post-conviction petition does not present an issue of federal constitutional import.  *See, e.g., Blake v. Hardy*, No. 10–cv–238, 2013 WL 5228670, at *10 (S.D. Ill. Sept. 16, 2013); *Karim v. Hardy*, No. 11 C 2700, 2013 WL 393330, at *8 (N.D. Ill. Jan. 31, 2013).  Jones

cites no federal case holding or suggesting that a state court's failure to hold an evidentiary hearing on a state post-conviction petition gives rise to a viable federal due process claim.

### Conclusion

For the foregoing reasons, the Court denies Jones's petition for a writ of habeas corpus and directs the Clerk to enter judgment in favor of respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 3, 2014